| | |
|---|---|
| **ATTORNEYS FOR PLAINTIFFS**<br>Hensley Law, LLC<br>Roxie L. Hensley, #6-3939<br>P.O. Box 1250<br>Laramie, WY 82070<br>Phone: 307.399.1651<br>Email:<br><br>*Pro Hac Vice Admission Forthcoming*<br>Law Offices of Randy B. Corporon, P.C.<br>Randy B. Corporon, #29861<br>Beth Chambers, #53474<br>2821 S. Parker Road, Suite 555<br>Aurora, CO 80014<br>Phone Number: 303.749.0062<br>Email:<br>Email: | |

| |
|---|
| **COMPLAINT** |

Plaintiffs, by and through undersigned counsel, respectfully submit their Complaint as follows:

## NATURE OF THE CASE

"In our system, state-operated schools may not be enclaves of totalitarianism. School officials do not possess absolute authority over their students. Students in school as well as out of school are 'persons' under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State. In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved. In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views."

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969).

This is a case where Albany County School District #1 ("ACSD") Board of Trustees

("Board") and ACSD Superintendent Dr. Jubal Yennie ("Superintendent Yennie"), knowingly

exceeded their prescribed statutory limits and enacted public health orders.  On September 8,

2021, the ACSD Board voted to implement a mask mandate for kindergarten through 12th

grade.  Despite the ACSD Board acknowledging its lack of statutory authority to mandate

masks, the ACSD Board decided that, because public health officials "refused to do their job,"

the ACSD Board must do it for them.  When G.S., a junior at Laramie High School ("LHS"),

organized the student body and spoke out against the unlawful actions of Defendants,

Defendants retaliated.  The ACSD Board, Superintendent Yennie, and LHS Principal Jeff

Lewis ("Principal Lewis") suspended G.S. numerous times and subsequently ordered that G.S.

be arrested for consciously objecting to their compelled speech.

Defendants cannot justify prohibition of a particular expression of opinion "with

which they do not wish to contend." *Tinker*, 393 U.S. at 511 (quoting *Burnside v. Byars*, 363

F.2d 744, 749 (5th Cir. 1966)).  At least part of the ACSD Board's purpose in mandating masks

was its desire that students "show" they are part of the solution.[1]  ACSD Board Trustee Beth

Bear conceded that she would vote for the public health measure irrespective of whether masks

were efficacious at stopping the spread of COVID-19.  Trustee Bear hoped the mask mandate

would shield ACSD from being closed to in-person learning by showing Wyoming state public

health officer Dr. Alexis Harrist that ACSD was doing more than other school districts.

---

[1] Governor Mark Gordon repeatedly described mask wearing as a "sign of respect."  *See* https://kgab.com/wyoming-governor-accepts-why-wear-a-mask-challenge ; https://m.facebook.com/governormarkgordon/photos/as-we-enter-memorial-day-weekend-have-fun-support-our-local-businesses-and-enjoy/159136428769186977_se_imp=0pHjikXNJPkX150Q7; https://www.jhnewsandguide.com/jackson_hole_daily/local/wyoming-governor-wear-a-mask/article_8818da35-37e8-5122-8fa6-2fa5fe27790b.html.

3

Without evidence that a mask mandate has ever, anywhere, been treated as part of a dress code,

ACSD Board Trustee Nate Martin analogized the mask mandate to the dress code.  According

to Trustee Martin, wearing a mask was no different than wearing pants.  Traditionally, dress

codes have been concerned with eliminating distractions and respecting the learning

environment of others.  Dress codes have never been enacted in lieu of a public health measure.

       The ACSD Board is correct that the wearing of masks can send a message.  The

Supreme Court has recognized that apparel can be speech:

> "As we shall discuss, the wearing of armbands…was closely akin to 'pure speech'
> which, we have repeatedly held is entitled to comprehensive protection under the
> First Amendment."

*Tinker*, 393 U.S. at 505-6.

       "To wear a mask in public is to affirm a viewpoint no less powerful than the Pledge

of Allegiance: that Covid poses a crisis so dire as to demand unprecedented government control

of our lives and a transformation of the norms of interpersonal behavior."[2]  The First

Amendment guarantees that citizens may not be compelled by the government to speak:

> "The First Amendment, made applicable to the states by the Fourteenth
> Amendment, forbids abridgment of the freedom of speech.  We have held time and
> time again that freedom of speech "includes both the right to speak freely and the
> right to refrain from speaking at all…" "

*James v. Am. Fed'n of State, County, & Mun. Employees, Council 31*, 138 S.Ct. 2448, 2463
(2018) (internal cites omitted).

       The right to be free from compulsion to carry the message of the government is a

---

[2] Referencing *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943), David B. Rivkin Jr. & James Taranto, Opinion, Face Masks and the First Amendment, WALL ST. J. (May 18, 2021, 12:41 PM) (arguing that not wearing a mask can be a form of signaling or a political statement that government-mandated masking requirements compromise).

fundamental and essential right guaranteed by the Constitution.

> "A system which secures the right to proselytize religious, political and ideological causes must also guarantee the concomitant right to decline to foster such concepts. The right to speak and the right to refrain from speaking are complimentary components of the broader concept of "individual freedom of mind."

*Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

The wearing of masks is a form of speech,[3] which cannot be compelled. The mask mandate violates First Amendment rights of free speech and requires strict scrutiny. But, because the ACSD Board had no delegated authority to promulgate public health orders and the ACSD Board's objective in forcing its students to wear masks was *political or ideological*, the mask mandate requires an even more exacting review than strict scrutiny. "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote...". *Barnette*, 319 U.S. at 638.

"First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students

---

[3] *Aryan v. Mackey*, 462 F. Supp. 90, 92-4 (N.D. Tex. 1978) (University's prohibition of Iranian students' wearing masks during demonstration against the Shah of Iran violated the First Amendment where the masks served a communicative function in that they had become symbols of protests against the Shah's regime and where, though the university had great interest in preventing violence on its campus, university officials were unable to point to any concrete facts which might reasonably have led them to predict that likelihood of violence was increased by wearing of masks. *See* U.S. Const. Amend. 1).

or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years." *Tinker*, 393 U.S. at 506. "There are village tyrants as well as village Hampdens, but none who acts under color of law is beyond reach of the Constitution." *Barnette*, 319 U.S. at 638.

## JURISDICTION AND VENUE

1.    This action arises under 42 U.S.C. §§ 1983 & 1988 in relation to Defendants' deprivation of Plaintiffs' constitutional rights. Accordingly, this Court has general jurisdiction over Plaintiffs' claims pursuant to Wyo. Const. Art. 5, § 10.

2.    Venue is proper in this judicial district pursuant to W.S. § 1-5-104(a)(ii) and W.S. § 1-5-108, because a substantial part of the acts or omissions giving rise to the claims for relief arose in or were directed to Albany County, Wyoming. Plaintiffs have suffered damages in Albany County, Wyoming resulting from Defendants' actions.

3.    This Court has personal jurisdiction over the Defendants because each Defendant is domiciled in Albany County or is a body corporate of Albany County, has sufficient minimum contacts with Albany County, and otherwise has intentionally availed himself, herself, or itself of significant benefits provided by Albany County, rendering the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

## PARTIES

4.    Plaintiff, Stephen Andrew Smith ("Andy Smith"), is an adult and the father of G.S. who, at all times relevant to the Complaint, was and is domiciled in Albany County, Wyoming.

5.    Plaintiff, Erin Smith, is an adult and the mother of G.S. who, at all times relevant to the Complaint, was and is domiciled in Albany County, Wyoming.

6

6.     Plaintiff, G.S. is a minor who, at all times relevant to the Complaint, was and is domiciled in Albany County, Wyoming. G.S. is referred to herein by her initials.

7.     Defendant, Board of Trustees for Albany County School District No. 1, is a body corporate and the governing body of Albany County School District No. 1.

8.     Defendant, Janice Marshall ("Chairman Marshall"), in both her individual and official capacities, is Chairman for the Albany County School District No. 1 Board of Trustees.

9.     Defendant, Nate Martin ("Trustee Martin"), in both his individual and official capacities, is a Trustee of the Albany County School District No. 1 Board of Trustees.

10.    Defendant, Kim Sorenson ("Trustee Sorenson"), in both his individual and official capacities, is a Trustee for the Albany County School District No. 1 Board of Trustees.

11.    Defendant, Lawrence Parea ("Trustee Parea"), in both his individual and official capacities, is a Trustee for the Albany County School District No. 1 Board of Trustees.

12.    Defendant, Emily Siegel-Stanton ("Trustee Siegel-Stanton"), in both her individual and official capacities, is a Trustee for the Albany County School District No. 1 Board of Trustees.

13.    Defendant, Beth Bear ("Trustee Bear"), in both her individual and official capacities, is a Trustee for the Albany County School District No. 1 Board of Trustees.

14.    Defendant, Dr. Jubal Yennie, Ed.D. ("Superintendant Yennie"), in both his individual and official capacities, was Superintendent for Albany County School District No. 1. The superintendent of schools is the chief administrative officer for Albany County School District No. 1. *See* W.S. § 21-3-111(a)(vi)(A).

7

15.     Defendant, Jeff Lewis ("Principal Lewis"), in both his individual and official

capacities, is the Principal for Laramie High School.  Principals assume the administrative

responsibility and instructional leadership of any schools to which they are assigned in

accordance with policies adopted by their board of trustees.  *See* W.S. § 21-3-111(a)(vi)(B).

## GENERAL ALLEGATIONS

"We are a policy board...and it is the responsibility of the state and county health officers to
make health decisions...we are not neurologists, immunologists, doctors..."

Albany County School District No. 1 Trustee, Jason Tangeman, September 1, 2021

### The Limited Authority of the Board of Trustees

16.     As the governing body of a school district,[4] the board of trustees in each school

district shall "[p]rescribe and enforce rules, regulations, and policies for its own government

and for the government of the schools under its jurisdiction."  *See* W.S. § 21-3-110.

17.     Notably, boards of trustees lack any power or duty to create and implement public

health orders.

18.     Rather, the statutory and regulatory scheme concerning communicable diseases

provides school districts with only two specific obligations and duties concerning such diseases.

19.     First, school officials must require that students provide written documentary proof

of immunization in order to be enrolled in school and may exclude students who do not provide

such proof.  *See* W.S. § 21-4-309(a).  (Notably, even the immunization requirement provides

waivers to students who are not vaccinated.  *Id.*)

20.     Second, a licensed health care provider employed by a school district as a healthcare

---

[4] "Each school district now or hereafter legally organized within this state shall be a body corporate."  *See* W.S. §
21-3-101.

8

worker is required to report certain communicable diseases to either the county or state health officer. *See* W.A.C. 048.0071.4 §§ 2 & 9.

21.     During an outbreak of a vaccine-preventable disease as determined by the state or county health authority, any exclusion from school of unvaccinated children shall be determined by the state or county health authority. *See* W.S. § 21-4-309(a).

22.     Nothing in the statutory and regulatory framework concerning communicable disease for school districts provides Defendants with the authority to exercise control over G.S. and restrict her from school.

23.     Instead, the health officer, not the school board or its members, has the duty to "isolate" or "restrict...an individual's freedom...to ensure individual and/or public health and welfare." *See* W.A.C. 048.0046.1 § 2(e).

24.     The statutory and regulatory framework authorizes only the health officer and/or authorized designee[5] to legally and formally restrict a person's freedom of movement or performance of an activity. *Id.*

### State and County Health Officers

25.     The Wyoming Department of Health ("WDH") through the state health officer is charged with the power and duty to regulate health in an epidemic or pandemic. *See* W.S. § 35-1-240.

26.     WDH shall also have the power to prescribe rules and regulations for the

---

[5] "Designee" is an individual appointed by the health officer and conducting official business for and on behalf of the Wyoming Department of Health, a county, city or district health office. *See* W.A.C. 048.0046.1 § 2(e).

management and control of communicable diseases. *See* W.S. § 35-4-101.

27.    The state health officer has the duty to "investigate and control the causes of

epidemic…diseases…affecting public health." *See* W.S. § 35-1-240(a)(ii).  This includes the

power and the duty to "exercise such physical control over the…persons…within this state as

the state health officer may find necessary for the protection of public health" (240(a)(iii)), to

"forbid gatherings of people when necessary to protect public health" (240(a)(iv)), and to

"disseminate public health information" (240(a)(xvii)).

28.    Public health orders of general applicability apply to *healthy* "individuals not under

an isolation or quarantine order" and "restrict[] individuals' movements or their ability to

engage in any activity." *See* W.S. § 35-1-240(c).

29.    In theory, these orders are "…designed to prevent or limit the transmission of a

contagious or possibly contagious disease…".  Yet, in reality they operate to subject healthy

individuals to significant restraints on fundamental liberties. *Id.*

30.    The Wyoming Legislature explicitly circumscribed the powers of health officers to

issue public health orders of general applicability to "a period of not more than ten (10) days."

*See* W.S. § 35-1-240(c) & 310(a).

### Wyoming Administrative Procedures Act

31.    Pursuant to the Wyoming Administrative Procedures Act ("Act") "[n]o agency[6] rule,

order or decision is valid or effective against any person or party, nor may it be invoked by the

---

[6] W.S. § 16-3-101(b)(i) "Agency" means any authority, bureau, board, commission, department, division, officer or
employee of the state, a county, city or town or other political subdivision of the state, except the governing body of
a city or town, the state legislature, the University of Wyoming, the judiciary, the consensus revenue estimating
group as defined in W.S. 9-2-1002 and the investment funds committee created by W.S. 9-4-720.

agency for any purpose, until it has been filed with the registrar of rules[7] and made available for public inspection as required by this act."[8] *See* W.S. § 16-3-102.

32.    "When the statutory delegation of power to a local governmental entity specifies a procedure to be followed in the exercise of that power, the procedure becomes a condition of and restriction upon the grant." *Schoeller v. Bd. of Cnty. Comm'rs of Park Cnty.*, 568 P.2d 869, 877 (Wyo. 1977).

33.    "An administrative agency's authority to promulgate rules is circumscribed by the statutes that govern its activities.  Rules promulgated in excess of an agency's authority are null and void." *Wyoming Downs Rodeo Events, LLC v. State*, 134 P.3d 1223, 1230 (Wyo. 2006) (citing *McLean v. Hyland Enterprises, Inc.*, 34 P.3d 1262, 1270 (Wyo. 2001)).  "An agency may not rewrite a statute through its rulemaking power."  *Id.* (citing *U.S. West Communications, Inc. v. Wyoming Public Service Commission,* 992 P.2d 1092, 1096 (Wyo.1999)).

34.    In accordance with the Act and its rulemaking power, the "board of trustees…may adopt rules for reasonable forms of punishment and disciplinary measures.  Subject to such rules…principals, and superintendents…may impose reasonable forms of punishment and disciplinary measures for insubordination, disobedience, and other misconduct." *See* W.S. §

---

[7] W.S. § 16-3-101(b)(viii) "Registrar of rules" for state agency rules means the secretary of state. "Registrar of rules" for local agency rules means the county clerk of the county in which the rule is to be effective.
[8] W.S. § 16-3-101(b)(ix) "Rule" means each agency statement of general applicability that implements, interprets and prescribes law, policy or ordinances of cities and towns, or describes the organization, procedures, or practice requirements of any agency.

11

21-4-308.

35.     ACSD Board policy states that "[a]ny new board policy can be added in accordance with the Wyoming Administrative Procedures Act." *See* ACSD Board Policy 1009, adopted October 12, 2016. ACSD Board Policy 1009 ("Policy 1009") also "…include[s] tentative adoption of a new policy."

36.     For both policy additions and policy revisions, Policy 1009 requires: (1) a minimum period of 45 days for the policy addition or revision to be made available for public inspection and comment; and (2) three separate readings, where the third and final reading occurs after the required 45-day public inspection and comment period.

37.     When an agency finds that an emergency requires the agency to proceed without notice or opportunity for hearing as required by W.S. § 16-3-103(a), it may adopt emergency rules. An emergency rule is effective when filed. *See* W.S. § 16-3-103(b).

38.     "Emergency rules…shall be effective for no longer than one hundred twenty days…". *Id.* An agency may adopt or extend an identical rule or emergency rule; however, in no case shall identical or substantially similar emergency rules be effective for a total period of more than two hundred forty days. *Id.*

39.     A local agency may proceed with the emergency rule when notice of the emergency is filed with the local registrar of rules. *Id.*

### ACSD Board Mask Mandate

40.     At the August 4, 2021, ACSD Board Meeting, Superintendent Yennie gave a COVID update to the Board of Trustees. He stated that, for the 2021-2022 school year, he would provide choice for parents and students regarding masking as there are no public health

12

orders ("PHOs") in place at either the state or local level.

    41.    Superintendent Yennie further clarified that he would not recommend that the ACSD Board mandate masks unless there was a PHO which required masks for ACSD.

    42.    Chairman Marshall also stated that the ACSD Board would not recommend masking to attend school.

    43.    Trustee Parea clarified that if community transmission rates and/or ACSD transmission rates change, Albany County Health Officer Dr. Jean Allais would issue PHOs addressing mitigation.

    44.    At the August 11, 2021, ACSD Board meeting, Superintendent Yennie stated that state and local health officers will not be mandating masking for the 2021-2022 school year.

    45.    At the August 23, 2021, ACSD Board Special Session, Superintendent Yennie requested that the ACSD Board implement an indoor mask mandate for kindergarten through 8th Grades. The mask mandate would remain in effect for one week until September 3, 2021.

    46.    Superintendent Yennie made the request to mandate masks even though the state and county public health officers had declined to enact PHOs mandating masks.

    47.    Upon Superintendent Yennie's request, Trustee Martin made a motion to the ACSD Board to open discussion and hold a vote on the request.

    48.    Trustee Martin asked Superintendent Yennie what would happen if a student refused to wear a mask. Superintendent Yennie stated that if a student refused to comply, he would revisit that issue with the ACSD Board.

    49.    Trustee Martin analogized the mask mandate to the dress code without evidence that

a mask mandate has ever, anywhere, been treated as part of a dress code.

50.    The ACSD Board approved the one-week mask mandate for kindergarten through 8th grade.  ACSD Board Trustee Jason Tangeman ("Trustee Tangeman") was the lone dissenting vote.

51.    Superintendent Yennie and the ACSD Board knowingly arrogated to themselves the delegated authority of the county health officer and the Wyoming Department of Health.

52.    On September 1, 2021, at the behest of Superintendent Yennie, the ACSD Board held a Special Session to vote on Superintendent Yennie's revised COVID mitigation plan, which included a mask mandate for kindergarten through 12th grades ("Mask Mandate").

53.    Superintendent Yennie also created a public health exit strategy for the COVID mitigation plan, which was based upon COVID transmission rates and/or at least 85% of Albany County residents being vaccinated.

54.    Superintendent Yennie's COVID mitigation plan would remain in effect until October 15, 2021.

55.    As part of her comments at the ACSD Board meeting, Dr. Allais spoke about the lack of effectiveness masking has if the entire population of Albany County is not masked. However, Dr. Allais refused to implement a PHO mandating masks for Albany County.

56.    While Superintendent Yennie acknowledged that he had no authority to implement PHOs, as he was not a public health official, he went on to state that he must act since those with lawful authority to promulgate PHOs refused to do their job.

57.    Trustee Martin again motioned the ACSD Board to discuss and vote on Superintendent Yennie's Mask Mandate.  ACSD Board Trustee Kim Sorenson ("Trustee

Sorenson") seconded Trustee Martin's motion.

58.    Trustee Tangeman, a lawyer, informed the ACSD Board that they did not have statutory authority to enact public health mandates.  However, this statement was met with silence from the other Trustees and Superintendent Yennie.

59.    ACSD Board Trustee Beth Bear ("Trustee Bear") stated that, even though WDH has refused to mandate masks, she would approve the Mask Mandate.

60.    Trustee Parea stated that he agreed with Superintendent Yennie.  If public health officers refuse to do their job, then the ACSD Board must do it for them.

61.    Trustee Parea stated that approximately 35 people were unable to testify at the September 1, 2021, Special Session.  He requested that the ACSD Board wait until September 8, 2021, to vote on the Mask Mandate.

62.    During the ACSD Board discussion, Chairman Marshall admitted she was not a doctor.

63.    ACSD Board Trustee Jamin Johnson ("Trustee Johnson") stated that state and local public health officers who have been delegated statutory authority to issue PHOs have abdicated that authority.

64.    However, Trustee Johnson stated that he will respect the clearly defined statutory lane of the ACSD Board, which is comprised of parents, not public health officials.

65.    Upon information and belief, Superintendent Yennie is not a public health officer, nor is he a designee of a public health officer.

66.    Upon information and belief, the Trustees of the ACSD Board who voted in favor of

15

the Mask Mandate are not public health officers, nor are they designees of a public health

officer.

67.    On September 8, 2021, the ACSD Board[9] voted to approve the Mask Mandate for

kindergarten through 12th grades.  Neither Superintendent Yennie nor the ACSD Board

discussed or recommended any disciplinary measures to accompany their unlawful expansion

of power.

68.    Absent any lawful authority to promulgate PHOs, the Mask Mandate was akin to

pure speech as more fully explained below.

**2021-2022 School Year**

69.    On August 26, 2021, G.S. began her Junior year at LHS.

70.    G.S. was a model student.  G.S. made straight A's and was enrolled in Advanced

Placement classes.  G.S. also had the lead role in the school play and was on the LHS dance

team.

71.    On September 9, 2021, after voting to implement Superintendent Yennie's COVID

mitigation plan and Mask Mandate, Chairman Marshall wrote a letter to Wyoming Governor

Mark Gordon requesting he validate the ACSD Board's decision to promulgate PHOs.

72.    At the same time Chairman Marshall was issuing a plea to Governor Gordon for

statutory authority to issue PHOs, LHS had already begun forcing students to leave school for

refusing to comply with the ACSD Board's Mask Mandate.  G.S. and approximately 20

students were forced to leave LHS for consciously objecting to the new compelled speech

---

[9] Trustees Bear, Martin, Sorenson, Stanton, and Parea, as well as Chairman Marshall voted in favor of the mask mandate.

policy.

73.   After leaving school, G.S. stood out front of LHS with two signs.  One sign said, "no more masks" and the other sign said, "join our peaceful protest."

74.   That night, G.S. communicated with students that the next morning on September 10, 2021, there was a nationwide walkout ("Walkout") to protest mask mandates.

75.   G.S. organized and led the LHS Walkout, which included approximately 80 students and 30 parents.

76.   Ten minutes prior to the Walkout, LHS officials announced via the P.A. system that any student who was involved in fall sports would be suspended from playing if he/she participated in the Walkout.

77.   After the Walkout, Superintendent Yennie described the protestors as "well-behaved" and "respectful."[10]  He went on to say that ACSD honors the First Amendment.

78.   Governor Gordon responded to Chairman Marshall's plea by stating he had requested the Wyoming Attorney General's Office issue an opinion regarding the authority of school boards to promulgate PHOs.

79.   Upon information and belief, the Wyoming Attorney General's Office never issued such an opinion.

80.   G.S. continued her silent message in opposition to the Mask Mandate by quietly opposing Defendants' decision to promulgate an unlawful policy and to remove Plaintiffs Andy

---

[10] https://www.wyomingnews.com/laramieboomerang/news/lhs-students-walk-out-of-class-protest-mask-mandate/article_cb75e090-8cb5-51b6-a500-131fc9d7003e.html

and Erin Smith's fundamental rights to make healthcare decisions for G.S.

81.    On September 15, 2021, Andy Smith, G.S., G.S.'s grandfather and G.S.'s uncle met with Superintendent Yennie to discuss the Mask Mandate.  G.S. and her family members asked Superintendent Yennie what statute the ACSD Board was relying upon to issue PHOs. Superintendent Yennie responded that W.S. § 21-3-110 gave the ACSD Board authority to implement PHOs.

82.    When G.S. requested Superintendent Yennie show her where W.S. § 21-3-110 granted public health authority to the ACSD Board, he balked, stating "[t]here is not an exact spot."

83.    G.S. and her family then asked Superintendent Yennie what disciplinary actions pertain to G.S. concerning her refusal to mask.  Superintendent Yennie stated "[i]t is the same as any other [ACSD] Board policy regarding student behavior.  It would be the [ACSD] Board's decision about what to do then."

84.    On September 21, 2021, Principal Lewis emailed Superintendent Yennie regarding a list of students, which included G.S., who refused to mask or to leave school.

85.    An hour later, Superintendent Yennie responded that "[he] will have to see what the [ACSD Board] wants to do about the adamant refusals."  He went on to say that he "shared [his] meeting with [G.S.'s family] with [Chairman Marshall].  It was not good."

86.    On September 23, 2021, Superintendent Yennie issued a memorandum to ACSD Principals regarding "Student Compliance with Universal Face Mask Requirement; Quarantine."  Even though Superintendent Yennie knew ACSD was not in compliance with applicable law, he directed ACSD Principals to "remind parents that [ACSD] is in compliance

with all applicable law, including the United States and Wyoming constitutions."

87.    On September 30, 2021, G.S. was assigned a two-day out of school suspension for "open defiance of the authority of the ACSD #1 Board of Trustees requirement for indoor mask use."

88.    Notably, G.S. was not suspended because she endangered anyone, harmed anyone or posed a safety risk.

89.    After G.S. returned to School on October 5, 2021, Principal Lewis issued her a second two-day out of school suspension for "…continu[ing] to demonstrate open defiance of the authority of the ACSD#1 Board of Trustees requirement for indoor mask use."

90.    G.S. refused to leave school property after being issued her second out of school suspension.  Larimer Police Department ("LPD") Officer Jason Bellman ("Officer Bellman") issued G.S. a $500 citation for trespassing.  The citation had a mandatory court appearance of November 15, 2021, at 9:00 AM and a cash bond of $500.

91.    Officer Bellman informed G.S. that if she did not choose between diversion or a court appearance prior to November 15, 2021, a warrant would be issued for her arrest.

### Arrest of G.S.

92.    G.S. returned to School on October 7, 2021, and was issued a third two-day out of school suspension for "…continu[ing] to demonstrate open defiance of the authority of the ACSD #1 Board of Trustees requirement for indoor mask use."

93.    Following a pre-suspension conference with LHS Administrator Jeremy Qualls on October 7, 2021, G.S., continued her quiet protest.

94.    G.S. also informed Officer Bellman of her right to remain in class at LHS.

95.    Officer Bellman subsequently issued another $500 citation for trespassing and asked G.S. to wait in the main office or leave LHS property.  G.S. again reminded Officer Bellman of her rights and her parents, Plaintiffs Andy and Erin Smith's, rights.

96.    LHS was put on lockdown and G.S. was handcuffed and arrested.  Officer Bellman drove her to the LPD where she was booked for trespassing and released to her father.

97.    Sean O'Sullivan, spokesperson for ACSD, stated that the lockdown was not due to any threats of violence or potential harm.[11]  Instead, "[t]he lockdown was issued to prevent further interruptions to academic learning."

98.    On October 7, 2021, an anonymous LHS student posted on Snapchat that they planned to "shoot up [LHS] tomorrow."

99.    Even though a legitimate school shooter threat was made, Defendants chose not to close LHS on October 8, 2021, nor did Defendants put LHS on lockdown.

100.   On October 12, 2021, LHS called Plaintiffs Andy and Erin Smith due to reports that G.S. had not returned to LHS because of "concerns about her safety."

101.   On October 13, 2021, G.S. spoke to the ACSD Board over Zoom and formally withdrew from LHS.

102.   Since withdrawing from LHS, G.S. has suffered in a myriad of ways, including but not limited to, emotional distress, lost earning capacity and mental anguish.

**First Claim for Relief**
**Deprivation of First Amendment Rights**
**Pursuant To 42 U.S.C. § 1983**

---

[11] https://www.wyomingnews.com/laramieboomerang/news/standoff-over-face-mask-results-in-lockdown-at-lhs/article_4f1fbe71-f4bc-50c8-bc18-2f6a7c3bc264.html

20

**(Plaintiffs Against All Defendants)**

103.    Plaintiffs hereby reiterate and adopt each and every allegation in the preceding paragraphs numbered 1 though 102.

104.    The First Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment to the United States Constitution and enforceable pursuant to 42 U.S.C. § 1983, provides that states may neither abridge the freedom of speech nor compel speech.

105.    "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State…subjects, or causes to be subjected, any citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law…" *See* 42 U.S.C. § 1983.

106.    At all times relevant to the actions described in this Complaint, Defendants were state actors pursuant to 42 U.S.C. § 1983.

107.    "The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted.  These have, of course, important, delicate, and highly discretionary functions, but none that they may perform outside the limits of the Bill of Rights.  That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *Tinker*, 393 U.S. at 507, *supra* (quoting *Barnette*, 319 U.S. at 637, *supra*).

21

108.    "In an academic environment, suppression of speech or opinion cannot be justified by an 'undifferentiated fear or apprehension of disturbance,' *Tinker*, 393 U.S. at 508, nor by 'a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.'" *Trotman v. Bd. of Trustees of Lincoln Univ.*, 635 F.2d 216, 230 (3d Cir. 1980) (quoting *Id.* at 509). Nor can the government compel a student to engage in conduct that expresses a state-approved message. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

109.    The ACSD Board had no authority to implement a Mask Mandate and no authority to issue a PHO, let alone a PHO of general applicability.

110.    The Mask Mandate was not promulgated by public health officials and therefore was not a public health measure. Instead, the Mask Mandate was an utterance and Defendants compelled G.S. "to utter what [wa]s not in h[er] mind." *Barnette,* 319 U.S. at 634.

111.    G.S. had a constitutional right and a duty to consciously object to compelled speech, which included: (1) organizing and leading the Walkout which peacefully demonstrated against the unlawful Mask Mandate; (2) speaking with Defendants regarding the unlawful and unconstitutional Mask Mandate; and (3) communicating a non-disruptive and symbolic message of pure speech by refusing to adhere to the Mask Mandate.

112.    G.S.'s pure symbolic speech communicated her disagreement with compelled speech which was unlawfully cloaked as a public health mandate.

113.    The compelled speech or Mask Mandate violated the Wyoming Constitution's

22

fundamental right for parents, including G.S.'s parents, to make health care decisions for their minor children.

114.    Numerous LHS students and staff informed G.S. that they received and understood G.S's pure symbolic speech.

115.    G.S.'s silent and non-disruptive expression of pure symbolic speech did not imminently threaten orderly operations at LHS.  However, Defendants sought to punish G.S. for consciously objecting through silent, passive expression of opinion, unaccompanied by any disorder or disturbance by her.

116.    Notwithstanding the ACSD Board and Superintendent Yennie openly acknowledging their complete lack of legislative power to promulgate PHOs, Defendants suspended G.S. on 3 separate occasions for open defiance of the "authority" of the ACSD Board.

117.    G.S. was not suspended because G.S. was a threat to public health and safety.

118.    Defendants further requested that LPD issue two trespassing citations, subsequently arrest G.S. at school, and take her to jail.

119.    It was the actions of Defendants which disrupted the orderly operations at LHS. Defendants were motivated by the speculative possibility of future disorder if G.S.'s symbolic expression of freedom was not suppressed and ultimately censored.

120.    "But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression.  Any departure from absolute regimentation may cause trouble.  Any variation from the majority's opinion may inspire fear.

23

Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, *Terminiello v. Chicago*, 337 U.S. 1 (1949); and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society." *Tinker*, 393 U.S. at 508–09.

121.    "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. The classroom is peculiarly the marketplace of ideas. The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, (rather) than through any kind of authoritative selection." *Tinker*, 393 U.S. at 512 (quoting *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967) (internal citation omitted) (internal quotation omitted).

122.    Defendants' deprivation of G.S.'s constitutional rights caused Plaintiffs' damages.

123.    As a direct and proximate result of Defendants violation of Plaintiffs' rights, Plaintiffs have in the past and will continue to suffer in the future, direct and consequential damage which include, but are not limited to, deprivation of educational opportunities mandated by the Wyoming Constitution and deprivation of constitutional rights in an amount to be proved at trial, as well as attorneys' fees and costs associated with this action.

**Second Claim for Relief**
**Violation of First Amendment – Retaliation of Speech**
**Pursuant To 42 U.S.C. § 1983**
**(Plaintiffs Against All Defendants)**

124.    Plaintiffs hereby reiterate and adopt each and every allegation in the preceding

paragraphs numbered 1 though 123.

125.   The Tenth Circuit examines First Amendment retaliation claims pursuant to *Worrell v. Henry*, 219 F.3d 1197 (10th Cir. 2000), which requires inquiry into whether: (1) plaintiff was engaged in constitutionally protected activity; (2) defendants' actions caused plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) defendants' actions were motivated by plaintiff's protected activity. *Abay v. City of Denver*, 445 F. Supp. 3d 1286, 1292 (D. Colo. 2020) (citing *Buck v. City of Albuquerque*, 549 F.3d 1269, 1292 (10th Cir. 2008)).

126.   G.S. was engaged in the constitutionally protected activity of free speech on matters of public concern.

127.   The Mask Mandate was not promulgated by public health officials and therefore was not a public health measure.  Instead, the Mask Mandate was an utterance and Defendants compelled G.S. "to utter what [wa]s not in h[er] mind." *Barnette,* 319 U.S. at 634.

128.   G.S. was engaged in a constitutionally protected activity when she consciously objected to compelled speech.

129.   G.S. further engaged in constitutionally protected activities when she: (1) organized and lead the Walkout which peacefully demonstrated against the unlawful Mask Mandate; (2) spoke with Defendants regarding the unlawful and unconstitutional Mask Mandate; and (3) communicated a non-disruptive and symbolic message of pure speech by refusing to adhere to the Mask Mandate.

130.   G.S.'s pure symbolic speech communicated her disagreement with compelled

25

speech which was unlawfully cloaked as a public health mandate.

131.    The compelled speech or Mask Mandate violated the Wyoming Constitution's fundamental right for parents, including G.S.'s parents, to make health care decisions for their minor children.

132.    Numerous LHS students and staff informed G.S. that they received and understood G.S's pure symbolic speech.

133.    G.S.'s silent and non-disruptive expression of pure symbolic speech did not imminently threaten orderly operations at LHS.  However, Defendants sought to punish G.S. for consciously objecting through silent, passive expression of opinion, unaccompanied by any disorder or disturbance caused by her.

134.    Superintendent Yennie was upset after meeting with G.S. and her family about the Mask Mandate and described the meeting as "not good."  After this meeting, Superintendent Yennie began enforcing the Mask Mandate against G.S.

135.    Superintendent Yennie and Principal Lewis could have suspended G.S. for "[a]ny behavior which in the judgment of the local board of trustees is clearly detrimental to the education, welfare, safety...of other pupils, including...habitually disruptive behavior..." *See* W.S. § 21-4-306(a)(iii).

136.    However, Defendants suspended G.S. for "open defiance of the authority of the ACSD #1 Board of Trustees requirement for indoor mask use."

137.    Defendants did not suspend every student who refused to wear a mask.  Nor did Defendants demand LPD arrest every student who refused to wear a mask.  Instead, Defendants targeted the most vocal opponent of Defendants' compelled speech, G.S., who was singled out

26

and targeted for suspension and arrest.

138.   The ACSD Board "...may not confer power upon itself.  To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override congress." *Louisiana Public Serv. Comm'n v. Federal Communications Comm'n*, 476 U.S. 355, 374-75 (1986).

139.   The actions of government officials, which included the ACSD Board, the Superintendent, and LHS Principal all acting under color of law caused G.S. and her parents' significant harm.

140.   The government officials openly acknowledged that the Mask Mandate went beyond their delegated statutory authority under Wyoming law, yet the same government officials harshly enforced the compelled speech against G.S.

141.   The actions of Defendants caused G.S. to suffer 3 suspensions, 2 $500 citations for trespass, and an arrest; injuries which would chill a person of ordinary firmness from consciously objecting to compelled speech and continuing to engage in pure symbolic speech.

142.   Ultimately, G.S. was forced to withdraw from LHS, a school environment where G.S. had previously excelled, due to the increasing hostility she faced each day from Defendants which culminated in her arrest.

143.   Defendants' retaliatory actions were motivated to silence the content of G.S.'s speech because it shined a light on their knowingly unlawful Mask Mandate.

144.   The actions of Defendants effectively censored G.S. from continuing to consciously object and share her pure symbolic speech.

27

145.   Defendants' retaliation against G.S. caused Plaintiffs' damages.

146.   As a direct and proximate result of Defendants' violation of Plaintiffs' rights,

Plaintiffs have in the past and will continue to suffer in the future, direct and consequential

damage which include, but are not limited to, deprivation of educational opportunities

mandated by the Wyoming Constitution and deprivation of constitutional rights in an amount to

be proved at trial, as well as attorneys' fees and costs associated with this action.

147.   Defendants acted intentionally, knowingly, willfully, wantonly, maliciously and

with reckless disregard when Defendants retaliated against G.S. for her constitutionally

protected speech under the First Amendment and are therefore subject to punitive damages.

**Third Claim for Relief**
**Violation of Fourteenth Amendment – Due Process**
**Pursuant to 42 U.S.C. § 1983**
**(Plaintiffs Against All Defendants)**

148.   Plaintiffs hereby reiterate and adopt each and every allegation in the preceding

paragraphs numbered 1 through 147.

149.   The Due Process Clause of the Fourteenth Amendment provides: "[N]or shall any

State deprive any person of life, liberty, or property, without due process of law…"

150.   The Due Process Clause forbids arbitrary deprivations of liberty.  *Goss v. Lopez*,

419 U.S. 565, 574 (1975).

151.   "Both general due process considerations of fairness and specific statutory

restrictions directly limit the manner in which an agency may exercise its designated

responsibilities." *Jackson v. State ex rel. Wyoming Workers' Comp. Div.*, 786 P.2d 874, 878

(Wyo. 1990) (citing *Cody Gas Company v. Public Service Comm'n,* 748 P.2d 1144, 1148 (Wyo.

1988)).  "Additional restrictions are imposed by the often-stated principle that an agency enjoys only those powers which the legislature has expressly conferred and the corollary rule of construction that statutes under which an agency purports to exercise a doubtful power must be strictly construed against the exercise of that power." *Jackson*, 786 P.2d at 878 (citing *Hupp v. Employment Security Comm'n*, 715 P.2d 223, 225 (Wyo. 1986)); *Tri–County Electric Ass'n, Inc. v. City of Gillette*, 525 P.2d 3, 8–9 (Wyo. 1974).

152.    Wyoming law[12] directs school districts to provide a free and accessible education to all children ages 5-21 subject to valid regulations of the board of trustees. *See* W.S.§ 21-4-301. Additionally, the Wyoming legislature has enacted compulsory attendance laws which require children ages 7-16 to attend a public or private school. *See* W.S. § 21-4-102(a).

153.    Pursuant to the Wyoming Constitution, Wyoming law and the facts in this case, G.S. plainly has a legitimate entitlement to a public education and to not be deprived of that right by an illegal compelled speech mandate.

154.    G.S. was suspended three times for "willful disobedience" of an illegal "[ACSD] Board policy."

155.    Prior to G.S.'s suspensions, G.S. was a straight A student who was involved in multiple extracurricular activities at a high level.

156.    Defendants failed to meet basic constitutional standards[13] of due process when they

---

[12] Violation of a state statute is actionable under § 1983 if it creates a liberty interest protectible by due process under the Fourteenth Amendment. *Montero v. Meyer*, 13 F.3d 1444, 1447 (10th Cir.1994).
[13] Federal due process rights are implicated when government actions "fail to meet basic constitutional standards." *Rector v. City & Cnty. of Denver*, 348 F.3d 935, 947 (10th Cir. 2003).

promulgated and enforced the Mask Mandate.

157.    The ACSD Board failed to adhere to the Wyoming Administrative Procedures Act and Policy 1009, when it enacted the Mask Mandate.

158.    Indeed, "[a]bsolute, arbitrary power over the lives, liberty, and property of freemen exists nowhere in a republic, not even in the largest majority." *See* Wyo. Const. Art. 1, § 7.

159.    G.S. has a constitutional right not to be arbitrarily and capriciously deprived of protected property interests, including, but not limited to, education, body autonomy, medical decision making, and to be afforded protection offered under the Wyoming Administrative Procedures Act and Policy 1009.

160.    Defendants' arbitrary and capricious deprivation of G.S.'s protected property interests caused Plaintiffs' damages.

161.    As a direct and proximate result of Defendants violation of Plaintiffs' rights, Plaintiffs have in the past and will continue to suffer in the future, direct and consequential damages which include, but are not limited to, deprivation of educational opportunities mandated by the Wyoming Constitution and deprivation of constitutional rights in an amount to be proved at trial, as well as attorneys' fees and costs associated with this action.

162.    Defendants acted intentionally, knowingly, willfully, wantonly, maliciously and with reckless disregard when Defendants arbitrarily and capriciously abused their power and deprived G.S. of her constitutionally protected property interests under the Due Process Clause and are therefore subject to punitive damages.

**Fourth Claim for Relief**
**Due Process – Parents' Fundamental Right to Care for their Children**
**Violation of Art. 1, § 38 and W.S. § 14-2-206(a)**

30

**(Plaintiffs Andy and Erin Smith Against All Defendants)**

163.    Plaintiffs hereby reiterate and adopt each and every allegation in the preceding paragraphs numbered 1 through 162.

164.    Plaintiffs Andy and Erin Smith have a fundamental right to care for G.S., and that includes the right to make medical and healthcare decisions for her. *See* Wyo. Const. Art. 1, § 38.

165.    "Each competent adult shall have the right to make his or her own health care decisions. The parent, guardian or legal representative of any other natural person shall have the right to make health care decisions for that person." *See* Wyo. Const. Art. I, § 38(a).

166.    "The liberty of a parent to the care, custody and control of their child is a fundamental right that resides first in the parent." *See* W.S. § 14-2-206(a).

167.    The Mask Mandate is a medical treatment, given that masks are authorized by the Food and Drug Administration for emergency use as a medical device used for medical purposes.

168.    Plaintiffs Andy and Erin Smith have a fundamental right to refuse health care decisions on behalf of their minor child, G.S.

169.    Defendants coerced, threatened, and suspended G.S. from school and subsequently had her arrested when Defendants had knowledge of Plaintiffs Andy and Erin Smith's decision to refuse a medical device for their healthy minor child.

170.    Defendants acted without regard for – and completely ignored – Plaintiffs' Andy and Erin Smith's fundamental right to the care, upbringing, and education of G.S., including the

right to make healthcare and medical decisions for her, and prevented G.S. from attending school.

171.    Accordingly, Defendants' removal of G.S. from LHS violated the Wyoming Constitution, W.S. § 14-2-206(a), and the fundamental rights of Plaintiffs' Andy and Erin Smith to make health care decisions for G.S.

### Fifth Claim for Relief
#### *Ultra Vires*
#### (Plaintiffs Against All Defendants)

172.    Plaintiffs hereby reiterate and adopt each and every allegation in the preceding paragraphs numbered 1 through 171.

173.    Under Wyoming law, educational matters affecting the school district shall be under the care of the various boards of trustees.

174.    The Wyoming legislature limited the power to issue public health orders when it expressly delegated to the Wyoming Department of Health and the various county health departments certain powers and duties to address outbreaks of disease; powers and duties which include issuing public health orders, disseminating public health information, and exercising control over a person for purposes of quarantine.

175.    The ACSD Board and Superintendent Yennie contend that because the Albany County Health Officer refused to issue a public health order, they were lawfully able to circumvent the express delegation of power to public health officials.

176.    Plaintiffs contend that the ACSD Board, Superintendent Yennie, and Principal Lewis knowingly and unlawfully usurped express powers delegated to public health officials when they promulgated and enforced the Mask Mandate.

177.    Instead of granting themselves unlawful powers to issue public health orders, the ACSD Board and Superintendent Yennie should have requested the county attorney act pursuant to W.S. § 35-1-103 regarding the WDH and the Albany County Public Health Officer's failure to perform their express duties under the law.

178.    Superintendent Yennie and Principal Lewis, with ACSD Board approval, suspended G.S. on three occasions for what they deemed open defiance of the authority of the ACSD Board's requirement for indoor mask use.

179.    Nothing in the statutory and regulatory framework concerning communicable disease provides Defendants with the authority to exercise control over G.S. and restrict her from school for not wearing a mask.

180.    Additionally, the ACSD Board did not follow the required procedures of Policy 1009 and the Wyoming Administrative Procedures Act prior to enacting and enforcing the Mask Mandate.

181.    Defendants' actions exceeded their delegated powers and usurped the express powers delegated to public health officials which constituted an arbitrary, capricious and an egregious abuse of power.

182.    As a direct and proximate result of Defendants *ultra vires* actions, Plaintiffs have in the past and will continue to suffer in the future, direct and consequential damages which include, but are not limited to, deprivation of educational opportunities mandated by the Wyoming Constitution and deprivation of constitutional rights in an amount to be proved at trial, as well as attorneys' fees and costs associated with this action.

183.    The Defendants' actions have further harmed Plaintiffs' fundamental constitutional rights pursuant to Art. I, § 38(a) of the Wyoming constitution and W.S. § 14-2-206(a).

**Sixth Claim for Relief**
**Declaratory Relief**
**W.S. § 35-1-310 Violates the Wyoming Constitution**
**(Plaintiffs Against All Defendants)**

184.    Plaintiffs hereby reiterate and adopt each and every allegation in the preceding paragraphs numbered 1 through 183.

185.    "Any person…whose rights, status or other legal relations are affected by the Wyoming constitution or by a statute, municipal ordinance, contract… may have any question of construction or validity arising under the instrument determined and obtain a declaration of rights, status or other legal relations." *See* W.S. § 1-37-103.

186.    "The powers of the government of this state are divided into three distinct departments: The legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted." *See* Wyo. Const. Art. II, § 1.

187.    The legislative power shall be vested in a senate and house of representatives, which shall be designated "the legislature of the State of Wyoming." *See* Wyo. Const. Art. III, § 1.

188.    "In its exercise of the legislative power, the legislative department has the exclusive power to determine and declare what acts shall constitute crimes and to prescribe punishments for those crimes." *Billis v. State*, 800 P.2d 401, 415 (Wyo. 1990) (citing *Baum v. State,* 745 P.2d 877, 882 (Wyo. 1987)) (citations omitted).

34

189.    The crucial test in determining whether there is an unlawful delegation is whether the statute contains sufficient standards to enable the agency to act and the courts to determine whether the agency is carrying out the legislature's intent. *Newport Int'l Univ., Inc. v. State, Dep't of Educ.*, 186 P.3d 382, 390 (Wyo. 2008) (citations omitted).

190.    The recently[14] enacted W.S. § 35-1-310 effectively creates up to three[15] additional public health agencies in each municipality and empowers these "public health agencies" to issue public health orders for any duration of time, while limiting statutorily empowered public health officers to a duration of 10 days.

191.    These rogue public health agencies are not accountable to the WDH[16] or the administrative agency in which the legislature delegated express powers and duties to oversee public health.

192.    W.S. § 35-1-310 is designed to prevent or limit the transmission of a contagious or possibly contagious disease.  However, the statute provides no guidelines which direct non-public health officials on how to prevent or limit transmission of diseases, nor does the statute define contagious disease or possibly contagious disease.

193.    Instead, W.S. § 35-1-310 cloaks non-public health officials with arbitrary discretion to "restrict[] individuals' movements or their ability to engage in any activity."

---

[14] July 1, 2021. *See* W.S. § 35-1-310.
[15] *See* W.S § 35-1-310(a)(i), (ii), (iii).
[16] W.S. § 35-1-227 states: "The county health officers of this state shall be under the direction and supervision of the state department of health, and the state department of health shall have authority to make rules and regulations for the government and direction of said county health officers as in their judgment may be best suited to maintain the public health."

35

194.   Express legislative standards are required when an individual is deprived of a liberty or property interest. *Wyoming Coalition v. Wyoming Game & Fish Com'n*, 875 P.2d 729, 732-33 (Wyo. 1994).

195.   Pursuant to W.S. § 1-37-103, Plaintiffs request that this Court declare W.S. § 35-1-310 unconstitutional for the following reasons: (1) W.S. § 35-1-310 does not provide for identifiable general standards with procedural safeguards which inhibit arbitrary or capricious decision making; (2) W.S. § 35-1-310 allows these newly created public health agencies to legislate through public health orders which may be issued for an indefinite duration of time and contain criminal punishment and civil fines; (3) W.S. § 35-1-310 contradicts the public health statutory scheme, including W.S. § 35-1-240(a) and (c), W.S. § 35-4-101; and (4) at least one of the newly created public health agencies has no obligation to comply with the Wyoming Administrative Procedures Act, which operates as a constitutional due process safeguard for administrative agencies. *See* W.S. § 16-3-101(b)(i); *see also* W.S. § 35-1-310(a)(ii).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendants as follows:

    a.   On Plaintiffs' first claim for relief, pursuant to 42 U.S.C. § 1983, that Defendants unconstitutionally violated G.S.s' first amendment free speech rights which caused Plaintiffs' damages that include direct, consequential, and punitive damages;

    b.   On Plaintiffs' second claim for relief, pursuant to 42 U.S.C. § 1983, that Defendants unconstitutionally violated G.S.'s first amendment free speech rights where G.S was engaged in a constitutionally protected activity, Defendants' retaliatory actions were motivated to silence the content of G.S.'s speech, Defendants' actions caused G.S. to suffer an injury which would chill a person of ordinary firmness from continuing to engage in that activity, and Defendants' retaliation against G.S. caused Plaintiffs' damages which include direct, consequential, and punitive damages;

c.  On Plaintiffs' third claim for relief, pursuant to 42 U.S.C. § 1983 and in violation of
G.S.'s due process rights, that Defendants' arbitrary and capricious deprivation of
G.S.'s protected property interests caused Plaintiffs' damages which include direct,
consequential, and punitive damages;

d.  On Plaintiffs' fourth claim for relief, that Defendants' removal of G.S. from LHS
violated the Wyoming Constitution, W.S. § 14-2-206(a), and the fundamental rights
of Plaintiffs' Andy and Erin Smith to make health care decisions for G.S.;

e.  On Plaintiffs' fifth claim for relief, that Defendants' actions exceeded their delegation
of power and usurped the express powers delegated to public health officials and
constituted an arbitrary, capricious and egregious abuse of powers and that, as a direct
and proximate result of Defendants *ultra vires* actions, Plaintiffs have in the past and
will continue to suffer in the future, direct and consequential damages which include,
but are not limited to, deprivation of educational opportunities mandated by the
Wyoming Constitution and deprivation of constitutional rights in an amount to be
proved at trial;

f.  On Plaintiffs' sixth claim for relief pursuant to W.S. § 1-37-103, a declaration that
W.S. § 35-1-310 violates Wyoming Constitution Article II, § 1 & Article III, § 1 and
is an unconstitutional delegation of power because: (1) W.S. § 35-1-310 does not
provide for identifiable general standards with procedural safeguards which inhibit
arbitrary or capricious decision making; (2) W.S. § 35-1-310 allows these newly
created public health agencies to legislate through public health orders which may be
issued for an indefinite duration of time and contain criminal punishment and civil
fines; (3) W.S. § 35-1-310 contradicts the public health statutory scheme, including
W.S. § 35-1-240(a) and (c), W.S. § 35-4-101; and (4) at least one of the newly
created public health agencies has no obligation to comply with the Wyoming
Administrative Procedures Act which operates as a constitutional due process
safeguard for administrative agencies. *See* W.S. § 16-3-101(b)(i); *see also* W.S. § 35-
1-310(a)(ii);

g.  Pre- and post- judgment interest;

h.  Costs and attorney fees; and

i.  For such other relief as the Court deems proper and just.

Respectfully submitted August 8, 2023.

                                HENSLEY LAW, LLC

                                */s/ Roxie Hensley*
                                Roxie L. Hensley, #6-3939
                                *Attorney for Plaintiffs*

37

**LAW OFFICES OF**
**RANDY B. CORPORON, P.C.**

*/s/ Beth Chambers*
Beth Chambers, Colorado Bar #53474
Randy B. Corporon, Colorado Bar #29861
*Attorneys for Plaintiffs*
*Pro Hac Vice Forthcoming*


Plaintiffs' Address:
1113 S. 4th Street, Laramie, WY 82070

38